# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ANTOINETTE MARZORATI, *et al.*,

    *Plaintiff*,

v.

MEDSTAR-GEORGETOWN MEDICAL CENTER, INC., d/b/a GEORGETOWN UNIVERSITY HOSPITAL, *et al.*,

    *Defendants.*

Civil Action No. 16-2161 (RDM)

## **MEMORANDUM OPINION**

For years, Antoinette Marzorati suffered from head pain. After an extended search for a remedy, she opted to undergo surgery to cure her headaches in 2008. But the surgery made the problem worse rather than better. Marzorati (along with her husband, who is suing for loss of consortium) ultimately filed this lawsuit in 2016, asserting claims of medical malpractice against her surgeon and the hospital where she received treatment, and negligence against the hospital. The defendants have moved to dismiss, arguing that Marzorati waited too long before suing and that, as a result, the District of Columbia's three-year statute of limitations for malpractice and negligence claims bars her case. For the reasons discussed below, the Court agrees that some of Marzorati's claims are barred by the statute of limitations, but concludes that the bulk of her case may proceed to discovery.

## I. BACKGROUND

For purposes of the pending motion to dismiss, the Court will accept the following facts, drawn from the amended complaint, as true. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

Seeking relief from head pain, Marzorati met with Dr. Ivica Ducic, a physician specializing in plastic surgery and peripheral nerve surgery, who was employed by defendants MedStar-Georgetown Medical Center and MedStar Health. Dkt. 8 at 3 (Am. Compl. ¶¶ 7–8). Ducic recommended that Marzorati undergo a surgical procedure known as an occipital neurectomy, involving a bilateral decompression of the dorsal and greater occipital nerves and bilateral transection of the lesser occipital nerves. *Id.* (Am. Compl. ¶ 12). He advised Marzorati that the operation would partially or completely relieve her pain and that its "only disadvantage" would be a "dime-sized area of numbness behind each ear." *Id.* at 4, 5 (Am. Compl. ¶¶ 15, 23).

Marzorati underwent the operation on January 5, 2008. *Id.* at 5 (Am. Compl. ¶ 21). After the procedure, "Marzorati was left with severe, untreatable, and disabling pain," which she describes as "much worse" than what she experienced before the surgery. *Id.* (Am. Compl. ¶ 24). During a follow-up examination in April 2008, Marzorati informed Ducic that her pain "had become worse after" the surgery. *Id.* (Am. Compl. ¶ 26). In response, Ducic assured Marzorati that her condition was "not unusual" and advised her that "some people require a second surgery." *Id.* (Am. Compl. ¶ 25). Due to the increased pain resulting from her first operation, Marzorati "decided against [undergoing a] further procedure." *Id.* (Am. Compl. ¶ 27).

Marzorati alleges that she "did not have notice of wrongdoing on the part of Dr. Ducic" until March 2016, when she searched online for articles about Ducic "because of her continuing headache and pain." *Id.* (Am. Compl. ¶ 29). At that point, Marzorati "discovered a webpage indicating that other people had filed lawsuits against Dr. Ducic and the other [d]efendants for medical malpractice for surgery similar to what . . . Marzorati received." *Id.* at 6 (Am. Compl. ¶ 30). That webpage, according to Marzorati, was first published in November 2014. *Id.* (Am. Compl. ¶ 32). On October 28, 2016, Marzorati filed this action. *See* Dkt. 1.

## II.  ANALYSIS

The parties agree that a three-year statute of limitations applies to Marzorati's lawsuit, which asserts claims for medical malpractice and negligence.  Dkt. 9-1 at 6; Dkt. 10 at 2 (citing D.C. Code § 12-301(8)).  They also agree that the "discovery rule" applies in cases in which the relationship between the plaintiff's injury and the defendant's conduct is obscure.  Dkt. 9-1 at 6; Dkt. 10 at 2.  Under that rule, a claim does not accrue at the time of injury but, instead, accrues at the time the plaintiff "know[s] (or by the exercise of reasonable diligence should know) (1) of the injury, (2) its cause in fact, and (3) of some evidence of wrongdoing" by the alleged tortfeasor.  *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423, 425 (D.C. 1986).  In assessing whether this test is satisfied, moreover, the Court must consider the relevant stage of the proceeding.  The D.C. Circuit has held, for example, that summary judgment is unavailable if a "genuine issue of material fact exists as to the ultimate question of when [the plaintiff] discovered or should have discovered [the defendant's] alleged malpractice." *Byers v. Burelson*, 713 F.2d 856, 861 (D.C. Cir. 1983); *see also Williams v. Mordkofsky*, 901 F.2d 158, 162 (D.C. Cir. 1990).  Because the present dispute arises at the motion to dismiss stage, defendants face an even higher hurdle.  They are not entitled to offer their own evidence—even if uncontested—but must rely, instead, exclusively on the factual allegations contained in Marzorati's complaint.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).  And, because a statute of limitations constitutes an affirmative defense, *see* Fed. R. Civ. P. 8(c), they cannot simply attack the sufficiency of the complaint.

Thus, to prevail on their statute of limitations defense at this early stage of the proceeding, defendants must demonstrate that "the allegations [contained in Marzorati's complaint affirmatively] show that relief is barred by the applicable statute of limitations."

*Jones v. Bock*, 549 U.S. 199, 215 (2007).  They must show, in other words, that the factual allegations of the complaint, read in the light most favorable to Marzorati, establish that she knew or should have known that she was injured, that the occipital neurectomy procedure caused her injury, and that there was "some evidence" that one or more of the defendants was at fault.  That is no easy task, and, under the present circumstances, it is not one that permits dismissal of the entire case.  But, as explained below, defendants have met this heavy burden with respect to one portion of Marzorati's malpractice claim.

Marzorati's claims fall into two general categories: claims that Ducic failed to obtain her informed consent before performing the surgery and her remaining claims, which assert, among other things, that Ducic performed the surgery in a negligent or reckless manner and that the hospital was negligent in its hiring practices, training, supervision, and the provision of medical services.  Dkt. 8 at 6–9 (Am. Compl. ¶¶ 36(a), 37, 44–45).  With respect to her lack-of-informed-consent claim, the Court concludes that the factual allegations contained in Marzorati's own complaint establish that she knew or should have known, as early as April 2008, that Ducic and the hospital had failed to inform her of the risk that the occipital neurectomy might make her pain worse, rather than better.  The same is not true, however, with respect to her remaining claims.

Beginning with Marzorati's lack-of-informed-consent claim, her complaint alleges that, before the surgery, Ducic told her "that the only disadvantage to performing the occipital neurectomy would be a dime-sized area of numbness behind each ear." *Id.* at 4 (Am. Compl. ¶ 15).  After the surgery, however, when Marzorati "was left with severe, untreatable, and disabling pain," Ducic told her that "her condition was not unusual and that some people require a second surgery." *Id.* at 5 (Am. Compl. ¶¶ 24, 26).  According to Marzorati's own allegations,

4

moreover, Ducic "specifically instructed her at the follow-up examination that her new pain was not an unexpected consequence of the first procedure." *Id.* (Am. Compl. ¶ 28). Those twin allegations—first, that she was told *before* the surgery that the "only disadvantage" was the risk that she would experience a small area of numbness and, second, that she was told *after* the surgery that worsened pain was "not an unexpected consequence"—form the core of her lack-of-informed-consent claim. Marzorati's own complaint, however, establishes that she was aware of both of these facts as early as April 2008, when her follow-up examination occurred. *Id.* at 4, 5 (Am. Compl. ¶¶ 15, 26, 28). Because Marzorati did not bring her lack-of-informed-consent claim for another eight-and-a-half years, and because she has failed to identify any reason to believe that this information was insufficient to put her on notice of (1) her corresponding injury (her worsened pain), (2) its cause (her decision to undergo the surgery), and (3) "some evidence of wrongdoing" by the defendants (defendants' failure to warn her about the risk of worsened pain), her lack-of-informed-consent claim is time-barred as a matter of law.

That same logic does not, however, extend to the remainder of Marzorati's claims. Those claims allege, among other things, that Ducic engaged in "[n]egligence, gross negligence, and reckless and willful misconduct in performing [the] occipital neurectomy," *id.* at 7 (Am. Compl. ¶ 36(d)), and that the hospital was negligent in hiring, training, and supervising Ducic, *id.* at 8–9 (Am. Compl. ¶¶ 44–45). Although Marzorati was undoubtedly aware of her injury (worsened pain following her surgery) in 2008, and although she did not bring suit within three years of sustaining that injury, that is not enough for defendants to prevail at this stage of the proceeding. To prevail on a motion to dismiss, defendants must be able to show that the allegations of the complaint themselves foreclose Marzorati's reliance on the discovery rule. They cannot satisfy that burden.

5

To start, it bears emphasis that the discovery rule applies with special force in medical malpractice cases. As the D.C. Court of Appeals has explained, this is because "an individual, more often than not, lacks the requisite expertise to know whether the ill effects of a particular medical treatment resulted from someone's wrongdoing, rather than merely an inevitable or unforeseeable risk of treatment." *Bussineau*, 518 A.2d at 430. That difficulty is only heightened, moreover, when a doctor "provide[s] reassurances that the manifestations of [an] 'injury' are simply part of the normal healing process." *Id.* at 426. Under those circumstances, according to the D.C. Court of Appeals, it asks too much to require patients to second-guess "the advice given by [their] treating physician[s]" on pain "of losing [their] right to legal redress." *Burns v. Bell*, 409 A.2d 614, 617 (D.C. 1979).

Taking the allegations of the complaint as true, Marzorati's remaining claims fit neatly within this reasoning. She alleges that she "had no reason to believe that . . . Ducic[ ] . . . had been negligent or that he had committed malpractice because he specifically instructed her [after the surgery] that her new pain was not an unexpected consequence of the first procedure," "that her condition was not unusual," and "that some people require a second surgery" to cure the type of persistent head pain she suffered. Dkt. 8 at 5 (Am. Compl. ¶¶ 26, 28). These facts are, in relevant respects, similar to those at issue in *Burns v. Bell*, 409 A.2d 614 (D.C. 1979). In that case, the defendant surgeon performed a facelift on the plaintiff in 1968. *Id.* at 614. After the operation, the plaintiff noticed "gross scars" and numbness, but the surgeon "explained that the scars would shrink in time" and that the numbness "would improve in time." *Id.* The plaintiff underwent a second facelift with the same surgeon in 1970 to reduce the scarring from the first operation, among other things. *Id.* at 615. She subsequently asked the doctor "[s]everal times" about her condition, and "each time she was assured that she was progressing satisfactorily and

6

that she would improve." *Id.* It was not until 1974, when the plaintiff saw the results of a friend's facelift, that she "concluded that she had not healed properly and could no longer rely upon [the defendant's] assurances." *Id.* "[U]nder the[se] . . . circumstances," the D.C. Court of Appeals concluded, "the determination of when [the plaintiff] should have reasonably discovered her injury [was] . . . a question of fact and should have been submitted to the trier of fact." *Id.* at 617.

The D.C. Court of Appeals reached a similar conclusion in *Bussineau v. President & Dirs. of Georgetown Coll.*, 518 A.2d 423 (D.C. 1986). In that case, the plaintiff sought dental treatment for a traumatic injury to her face and mouth. *Id.* at 425. During the course of treatment, she "often expressed dissatisfaction with the results" and "complained both [orally] and in writing," but "was regularly reassured that the diagnosis and treatment [were] proper." *Id.* The plaintiff ultimately sought a second opinion from an independent dentist and brought suit within three years of that consultation. *Id.* The D.C. Court of Appeals, once again, held that the date on which the plaintiff's malpractice claim accrued was disputed and thus for the trier of fact to resolve. *Id.*

Defendants in this action are on even shakier footing than the defendants in *Burns* and *Bussineau*. In *Burns* and *Bussineau*, the D.C. Court of Appeals considered whether the summary judgment record was sufficiently one-sided that no reasonable trier of fact could find that the discovery rule postponed the date of accrual. *Burns*, 409 A.2d at 615; *Bussineau*, 518 A.2d at 424. Here, in contrast, defendants have moved to dismiss the amended complaint, and thus no summary judgment record exists, no discovery has occurred, and Marzorati's factual allegations must be accepted as true. Those factual allegations, moreover, do not come close to establishing that Marzorati knew or should have known that Ducic's assurances that the results of her surgery

7

were "not unusual" could not be trusted and that, in fact, Ducic and the hospital had botched her surgery.

Defendants take issue with this reasoning and argue that the combination of Ducic's assurance before Marzorati's surgery that "the only disadvantage to" the surgery "would be a dime-sized area of numbness" and the "severe, untreatable, and disabling pain" she suffered after her surgery should have prompted her to investigate whether Ducic had mishandled the surgery. Dkt. 9-1 at 9. Although not entirely clear, this argument might take one of two forms, neither of which suffices for present purposes.

First, defendants' argument might posit that, having been assured that the only risk of the surgery was some numbness, Marzorati was on notice that her worsened pain was not an ordinary consequence of the surgery, and, accordingly, she should have inquired whether, perhaps, Ducic had botched the surgery. The question whether the inconsistency between Ducic's promised result and the actual result of her surgery was sufficient to put Marzorati on inquiry notice, however, is "highly fact-bound," *Diamond v. Davis*, 680 A.2d 364, 372 (D.C. 1996), and is the type of question that is typically reserved for the trier of fact. Here, moreover, Marzorati alleges ample facts to preclude resolution of this issue on the pleadings. She alleges, for example, that Ducic affirmatively misled her by assuring her that her worsened condition was "not unusual." Dkt. 8 at 5 (Am. Compl. ¶ 26).

Second, defendants suggest that knowledge that Ducic had misled Marzorati about the risks associated with the surgery was sufficient, as a matter of law, to put Marzorati on notice that she needed to investigate the *full* extent of defendants' purported misdeeds. In support of this contention, defendants note that D.C. case law requires that a plaintiff only have "some evidence of wrongdoing" and that the statute of limitations is not tolled merely because "the

8

plaintiff does not know or cannot be charged with *complete* knowledge of the full breadth and nature of a defendant's alleged tortious action." Dkt. 9-1 at 7 (citing *Brin v. S.E.W. Inv'rs*, 902 A.2d 784, 792 (D.C. 2006)) (emphasis added). That case law, however, merely establishes that the plaintiff need not be "aware of all of the relevant facts," *Hendel v. World Plan Exec. Council*, 705 A.2d 656, 661 (D.C. 1997), have "full knowledge of the extent of [the defendant's] alleged wrongdoing," *Morton v. Nat'l Med. Enters., Inc.*, 725 A.2d 462, 469 (D.C. 1999), or be "aware of each essential element of his cause of action," *Cevenini v. Archbishop of Wash.*, 707 A.2d 768, 771 (D.C. 1998). "[T]he standard of 'some evidence of wrongdoing' is far from a precise one," *Diamond*, 680 A.2d at 380, but the essential inquiry asks "'whether the plaintiff exercised reasonable diligence under the circumstances in acting or failing to act on whatever information was available to him,'" *Brin*, 902 A.2d at 795 (citation omitted). That inquiry, in turn, is fact-bound and, "'[u]nless the evidence regarding the commencement of the running of the statute of limitations is so clear that the court can rule on the issue as matter of law, the jury should decide the issue on appropriate instructions.'" *Id.* (citations omitted).

The Court cannot conclude on the bare pleadings that Marzorati failed to exercise "reasonable diligence" by not investigating whether Ducic competently performed her occipital neurectomy. As an initial matter, that claim is sufficiently distinct from Marzorati's lack-of-informed-consent claim that the Court cannot conclude, as a matter of law, that Marzorati's knowledge that Ducic failed to disclose the risks of the surgery was sufficient to trigger a duty to investigate whether Ducic had committed a separate tort by botching the surgery. Indeed, a reasonable factfinder might draw just the opposite conclusion. The premise of Marzorati's lack-of-informed-consent claim is that worsened pain is a "not unusual" risk of the occipital neurectomy procedure—even if properly performed. Had she known of that risk, in turn, she

might have declined to undergo the procedure in the first place. The premise of her negligence theory, in contrast, is that worsened pain is not an accepted risk of the surgery. If properly performed, the surgery would not have had that result. Accordingly, a belief that the worsened pain was the type of usual risk that Ducic should have disclosed before the surgery might have led her to discount the possibility that Ducic, in fact, simply botched the procedure.

The determination whether Marzorati engaged in reasonable diligence, moreover, does not merely turn on the arguable disconnect between the wrongdoing of which she was aware (Ducic's failure to warn her about the risk of worsened pain) and that of which she was unaware (Ducic's failure to perform the procedure in a competent manner). It also turns on a range of other circumstances, including "but . . . not limited to, the conduct and misrepresentations of the defendant, and the reasonableness of the plaintiff's reliance on the defendant's conduct and misrepresentations." *Diamond*, 680 A.2d at 372; *see also Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 946 (D.C. 2003). Because Marzorati plausibly alleges that Ducic misled her by assuring her that her worsened pain was "not an unexpected consequence of the . . . procedure," Dkt. 8 at 5 (Am. Compl. ¶ 28), there exists "a disputed question about [Marzorati's] diligence in investigating a possible cause of action," *Doe*, 814 A.2d at 946. For all of these reasons, the Court cannot conclude as a matter of law that she failed to exercise reasonable diligence in investigating whether her injury was caused by Ducic or the hospital's incompetence.

## CONCLUSION

Defendants' motion to dismiss, Dkt. 9, is hereby **GRANTED** with respect to Marzorati's claim that Ducic failed to secure her informed consent for the surgery and is otherwise **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss  
RANDOLPH D. MOSS  
United States District Judge

Date: July 14, 2017