UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTOINETTE MARZORATI, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MEDSTAR-GEORGETOWN MEDICAL CENTER, INC. d/b/a/ GEORGETOWN UNIVERSITY HOSPITAL, *et al.*, <br><br> *Defendants.* | Civil Action No. 16-2161 (RDM) |

## MEMORANDUM OPINION AND ORDER

Antoinette Marzorati ("Marzorati") and her husband, Lawrence Marzorati, (collectively, "Plaintiffs") are suing MedStar Georgetown Medical Center, Inc., d/b/a Georgetown University Hospital ("MGUH") and Dr. Ivica Ducic for medical malpractice arising from Marzorati's unsuccessful nerve surgery in January 2008. The matter is before the Court on Defendant MGUH's motion for partial summary judgment on Plaintiffs' claims for negligent hiring, supervision, and training, Dkt. 36, and Dr. Ducic's motion for partial summary judgment, or, in the alternative, for judgment on the pleadings on Plaintiffs' claims for punitive damages, Dkt. 37. For the reasons set forth below, the Court will **GRANT** MGUH's motion, Dkt. 36, and will **DENY** Dr. Ducic's motion, Dkt. 37, without prejudice.

### I. BACKGROUND

Marzorati met with Dr. Ducic, a physician specializing in plastic surgery and peripheral nerve surgery, to treat her chronic headaches. Dkt. 8 at 3 (Amd. Compl. ¶ 8). At the time, Dr. Ducic was employed by MGUH. *Id.* (Amd. Compl. ¶ 7). Dr. Ducic recommended that Marzorati undergo a surgical procedure known as an occipital neurectomy, which involves a

bilateral decompression of the dorsal and greater occipital nerves and a bilateral transection of the lesser occipital nerves. *Id.* (Amd. Compl. ¶ 12). Marzorati underwent the operation on January 5, 2008. *Id.* at 5 (Amd. Compl. ¶ 21). Afterwards, Marzorati alleges that she was "left with severe, untreatable, and disabling pain," which she describes as "much worse" than what she experienced before the surgery. *Id.* (Amd. Compl. ¶ 24). When Marzorati described her symptoms during a follow-up visit, Dr. Ducic informed her that they were "not unusual" and advised her that "some people require a second surgery." *Id.* (Amd. Compl. ¶ 26). Marzorati, however, "decided against [undergoing a] further procedure," *id.* (Amd. Compl. ¶ 27), because of her frustration with the results of her first surgery.

In October 2016, more than eight years after the surgery, Marzorati and her husband filed suit against Dr. Ducic, MGUH, and MedStar Health, Inc. d/b/a/ MedStar-Georgetown Medical Center, Inc. d/b/a Georgetown University Hospital ("MedStar Health").[1] Dkt. 1. Their amended complaint alleges medical negligence and loss of consortium (against Dr. Ducic and MGUH) and negligent hiring/supervision/training (against MGUH). Dkt. 8 at 6–9 (Amd. Compl. ¶¶ 33–51). Marzorati seeks $60,000,000 in compensatory damages and $10,000,000 in punitive damages from Dr. Ducic. *Id.* at 8 (Amd. Compl. ¶ 42). Her husband seeks $10,000,000 for loss of consortium. *Id.* at 9 (Amd. Compl. ¶ 51).

Previously, Defendants moved to dismiss the amended complaint as time-barred. *See* Dkt. 9 at 3 (citing D.C. Code § 12-301(8) (setting forth a three-year statute of limitations for negligence actions)). The Court granted in part and denied in part that motion. *See Marzorati v. MedStar-Georgetown Med. Ctr., Inc.*, 265 F. Supp. 3d 24 (D.D.C. 2017). The Court dismissed

---

[1] MedStar Health was previously dismissed from this case by stipulation of the parties. *See* Minute Order (Apr. 17, 2018).

Marzorati's informed consent claim because "the factual allegations contained in Marzorati's own complaint establish[ed] that she knew or should have known, as early as April 2008, that [Dr.] Ducic and the hospital had failed to inform her of the risk that [her surgery] . . . might make her pain worse, rather than better." *Id.* at 27.  The Court declined to dismiss Marzorati's negligence claims, however, because the Court could not conclude "as a matter of law" that Marzorati had "failed to exercise reasonable diligence in investigating whether her injury was caused by [Dr.] Ducic or the hospital's incompetence." *Id.* at 30.

After the close of discovery, Defendants moved for summary judgment on the same ground.  *See* Dkt. 35 at 3–4 (arguing that Marzorati's negligence claims are time-barred).  In addition, MGUH moved for partial summary judgment on Marzorati's negligent hiring, training, and supervision claims, Dkt. 36, and Dr. Ducic moved for partial summary judgment, or, in the alternative, for judgment on the pleadings, on Marzorati's claim for punitive damages, Dkt. 37.  The Court held oral argument on all three motions on March 14, 2019.  At the hearing, the Court denied Defendants' statute of limitations motion on the ground that there exists "a genuine dispute of material fact as to whether [Marzorati] had any reasonable belief or inquiry notice that she was the victim of Dr. Ducic's alleged malpractice before [March 2016]; and, if so, whether reasonable due diligence required her to investigate Dr. Ducic's assurances that her failed surgery was normal."  Dkt. 54 at 34 (Motions Hrg. Tr.).  The Court reserved on the issue of punitive damages.  *Id.* at 80–81 (Motions Hrg. Tr.).  With respect to Plaintiffs' negligent hiring, training, and supervision claims, the Court expressed skepticism that there was sufficient evidence that "MedStar Georgetown actually had reason to believe that Dr. Ducic was engaged in dangerous behavior." *Id.* at 38 (Motions Hrg. Tr.).  The Court, nevertheless, permitted the

parties to submit supplemental briefing on that issue, *see id.* at 66–67 (Motions Hrg. Tr.). Briefing is now complete.

## II.  LEGAL STANDARD

A party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor. *See Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

If the moving party carries this initial burden, the burden then shifts to the nonmoving to show that sufficient evidence exists for a reasonable jury to find in his or her favor with respect to the "element[s] essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (quoting *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006)).  The nonmoving party's opposition must, accordingly, consist of more than unsupported allegations or denials, and must be supported by affidavits, declarations, or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, if the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to

4

find in his or her favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court should grant summary judgment. *Liberty Lobby*, 477 U.S. at 249–50.

## III. ANALYSIS

### A. MGUH's Motion for Partial Summary Judgment

MGUH moves for partial summary judgment on Plaintiffs' negligent hiring, supervision, and training claims. Dkt. 36. At oral argument, Plaintiffs' counsel conceded that Plaintiffs are no longer pursuing their claims for negligent hiring. Dkt. 54 at 37–38 (Motions Hrg. Tr.). Moreover, Plaintiffs' counsel did not make any argument as to Plaintiffs' negligent training claims, and Plaintiffs failed to oppose MGUH's motion for partial summary judgment on those claims in their brief in opposition or in their supplemental briefing. *See* Dkt. 42; Dkt. 51. The Court will, accordingly, grant summary judgment in favor MGUH on Plaintiffs' claims for negligent hiring and training and will consider only Plaintiffs' claims against MGUH for negligent supervision/retention.[2]

Under D.C. law, a plaintiff alleging negligent supervision must provide factual evidence that the employer "knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Rawlings v. District of Columbia*, 820 F. Supp. 2d 92, 114 (D.D.C. 2011) (quoting *District of Columbia v. Tulin*, 994 A.2d 788, 794 (D.C. 2010)). In order to succeed, the plaintiff must provide "proof that the employer breached a duty to plaintiff to use reasonable care in the supervision or retention of an employee which

---

[2] According to Plaintiffs, "the case law often refers to" a negligent supervision claim as "retention and supervision." Dkt. 54 at 37–38 (Motions Hrg. Tr.).

proximately caused harm to plaintiff." *Phelan v. City of Mount Ranier*, 805 A.2d 930, 940 (D.C. Cir. 2002). In other words, the plaintiff must show that the employer's negligence was a "substantial factor" in causing the plaintiff's injury. *Rawlings*, 820 F. Supp. 2d at 114 (citations omitted).

MGUH argues that Plaintiffs' negligent supervision claims fail for two reasons. First, there is no evidence that Dr. Ducic behaved in a "dangerous or otherwise incompetent manner," *id.*, prior to Marzorati's surgery in January 2008, let alone that MGUH knew or should have known about that conduct, Dkt. 53 at 3. Second, MGUH exercised "reasonable care," *Phelan*, 805 A.2d at 940, in supervising Dr. Ducic, Dkt. 53 at 4. In support of its argument, MGUH points to the testimony of its corporate representative, Dr. Lisa Boyle. Dr. Bolye testified that, at the time of Marzorati's operation, Dr. Ducic was accredited to perform peripheral nerve surgery at MGUH. Dkt. 53-2 at 6 (Ex. B) (Boyle Dep.) ("[Dr. Ducic] had full and unrestricted privileges to do peripheral nerve surgery."). She described MGUH's multi-stage accreditation process as follows:

> Every two years once you're appointed to the medical staff you have to apply for reappointment and go through that entire review process. And Dr. Ducic, . . . he was here for almost eleven years . . . . Those reviews are done with the credentials committee, which is a multidisciplinary committee of peers. The next level of approval is at the medical executive committee, which, again, is the medical leadership, and finally the board of directors have the ultimate fiduciary authority for oversight and approval. Every two years he went through that process of oversight.

Dkt. 36-7 at 8 (Ex. C) (Boyle Dep.). Dr. Boyle testified that Dr. Ducic also attended bi-weekly department meetings hosted by the Department Chair, which were for the "express purpose of peer review." *Id.* When asked whether anyone had ever observed Dr. Ducic perform peripheral nerve surgery, Dr. Boyle responded that, while it was common for as many as "15 people" to be in an operating room working on and observing a procedure, in Dr. Ducic's case, there were no

circumstances "that necessitated [the Department Chair] or his designee to personally observe" Dr. Ducic's procedures because "he's an extraordinarily highly regarded peripheral nerve surgeon" with "no concerns expressed around his technique." *Id.* Dr. Boyle further testified that there were no "red flags on any questions or concerns expressed" about Dr. Ducic's practice during his entire tenure at MGUH. *Id.*

Plaintiffs, for their part, do not contest any of these factual assertions, nor do they take issue with MGUH's accreditation or peer-review mechanisms. Instead, they principally argue that a reasonable trier of fact could infer that MGUH was negligent because, "had [it] properly supervised Dr. Ducic, the controversial nature of his practices should have been evident." Dkt. 51 at 5. According to Plaintiffs, MGUH should have discovered that Dr. Ducic was committing malpractice because "cutting nerves at all for headache[s] is malpractice." *Id.* at 3. In support of their argument, Plaintiffs cite the expert report of Dr. Michael Dogali, who opined that the procedure performed here—a neurectomy—had long been "abandoned" by the medical community. Dkt. 28-1 at 6 (Dogali Expert Rpt.). The relevant portion of Dr. Dogali's expert report states in full:

> From the late 1800's to the mid 1900's, surgeons routinely attacked neuropathic intractable pain when medical therapy failed. Individuals with trigeminal or occipital neuralgia were subjected to avulsion, excision and/or destruction of the involved nerve (neurectomy). The results were protean. A small number of patients were freed of their pain. Many patients experienced recurrence of the pain within a few months due to development of neuromas or scar tissue formation. Successful pain relief was associated with numbness or even anesthesia of the treated area. In most patients, the change in sensation due to the surgical nerve injury was unpleasant and about a third of the patients developed painful anesthesia, i.e., anesthesia dolorosa. Anesthesia dolorosa is neuropathic pain in an anesthetic area. This condition often leads the patient to suicide because of the severity of the neuropathic pain. ***Given the overall failure rate due to pain recurrence, unpleasant numbness and the 30% incidence of severe neuropathic pain resulting from such surgery, neurectomy was abandoned by neurosurgical departments and peripheral nerve surgeons at all US medical centers by 1970***.

7

*Id.* at 6 (Dogali Expert Rpt.) (emphasis added). Plaintiffs also point to Dr. Ducic's own testimony acknowledging that "[s]ome physicians advise patients that cutting nerves is dangerous." Dkt. 51-1 at 7 (Ducic Dep.).

In the alternative, Plaintiffs argue that, at the very least, Dr. Ducic's practice of cutting nerves without confirmatory testing falls below the national standard of care. *See* Dkt. 54 at 43–44 (Motions Hrg. Tr.). They point to Dr. Ducic's testimony that he has, in the past, performed nerve surgery without a "block or Botox first being used" because "those patients had obvious presentation and findings on the exam that additional confirmation would not sufficiently or at all change the plan." Dkt. 51-1 at 2 (Ducic. Dep.). According to Plaintiffs, that conduct falls below the national standard of care. They cite the deposition testimony of MGUH's expert witnesses, Dr. Jeffrey Janis and Dr. William Austen. When asked whether "a nerve block or similar procedure" should be performed prior to an excision, Dkt. 48-4 at 9 (Ex. D) (Austen Dep.), Dr. Austen testified:

> A. So—and the standard is quite wide here. And many of us certainly like nerve blocks. The history of nerve blocks can be good enough. Botox can be good enough. I personally really like nerve blocks.
>
> . . .
>
> A. But if somebody comes in with a great story and said, you know, I got nerve blocks and I got better for a day, whatever—there are definitely—and they sometimes don't want a nerve block or they are not having enough pain at the time for a nerve block. There are certainly some patients that I don't do a nerve block before operating.
>
> Q. And including in the context of decompression and excision you have done—have you done any excisions without prior nerve blocks or Botox?
>
> A. No.

*Id.* at 9–10 (Ex. D) (Austen Dep.). Dr. Janis similarly testified:

8

> A. Yeah. I'm kind of reviewing in my mind how to answer that because I'm sure that somewhere along the way that I have taken somebody to the operating room based on history or the constellation of symptoms as I described, physical exam.
>
> But your question was . . . whether I have taken somebody to the operating room if they have never had a nerve block, never had Botox, or never had a Doppler. Am I understanding that correctly?
>
> Q. Correct.
>
> A. I would say that, if I did, it would be an extremely atypical case. I don't have to be the one to perform the nerve block, the Botox, or the Doppler. But I would say my typical patient has had at least one of those done in sometime in the past.

Dkt. 49-4 at 5 (Janis Dep.). Based on the above, Plaintiffs argue that MGUH should have been aware that Dr. Ducic was committing malpractice. The Court is unpersuaded.

To begin, Dr. Dogali's expert report is insufficient to create a genuine dispute of material fact as to whether cutting nerves to treat headaches constitutes malpractice because the report cites *no evidence* in support of that assertion. *See Martin v. Omni Hotels Mgmt. Corp.*, 321 F.R.D. 35, 40 (D.D.C. 2017) ("In this circuit, a party cannot avoid summary judgment when it offers an expert opinion that is speculative and provides no basis in the record for its conclusions."). Nor does Dr. Ducic's remark that "[s]ome physicians advise patients that cutting nerves is dangerous," Dkt. 51-1 at 7 (Ducic Dep.), suffice to create a genuine dispute. Even if some physicians were to view the procedure as "dangerous," that is not an admission that performing a neurectomy is "malpractice." Moreover, the only doctor that Dr. Ducic identified as opposing the procedure, Jessica Ailani, testified that she had never made such a comment because she is not a surgeon, and she would not "know much about [Dr. Ducic's] technique." Dkt. 53-3 at 2 (Ailani Dep.).

MGUH, in contrast, offers the expert reports of Dr. Austen and Dr. Janis, plastic surgeons who specialize in and currently practice peripheral nerve surgery. *See* Dkt. 48. Both testified that neurectomies are, in fact, routinely performed, and Dr. Austen testified that he has performed hundreds of these procedures. *See* Dkt. 48-1 at 1 (Austen Expert Rpt.) ("I routinely perform neurolysis and decompression" on patients with "occipital neuralgia similar to Ms. Marzorati" and "would and have performed neurectomy as needed."); *id.* at 2 ("I am . . . a surgeon who operates on approximately 100 migrain patients per year."); *id.* at 3 ("The resection of a neuroma/nerve on the left side would have been the standard of care in 2008 and is still the standard of care today."); Dkt. 48-2 at 3 (Janis Expert Rpt.) ("[O]cciptal neurectomy is, and has been, a decades-old established procedure that is utilized in certain patient subpopulation . . . . Dr. Dogali seems unaware of the official position statement released by the American Society of Plastic Surgeons reviewing the available evidence over the last two decades and confirming support for this procedure as appropriate and evidence-based."). In light of the above, no reasonable jury could find that neurectomies are an "abandoned" procedure and that MGUH should have stopped Dr. Ducic from performing them.

Perhaps realizing that Dr. Dogali's claim that neurectomies are per se malpractice lacks support, Plaintiffs fall back on their argument that MGUH nevertheless should have known that Dr. Ducic was committing malpractice because he performed peripheral nerve surgery without "indication"—that is, he operated on patients who did not have a prior nerve block or Botox injection. Dkt. 51 at 3. Even assuming arguendo that the national standard of care requires a diagnostic nerve block or Botox before performing a nerve excision,[3] there is no evidence that

---

[3] On this point, there is a genuine dispute whether Botox or nerve blocks are necessary. Dr. Janis testified, for instance, that a strong history together with a physical exam may be sufficient

10

Dr. Ducic performed neurectomies without indication before Marzorati's surgery and while employed at MGUH. The testimony that Plaintiffs recite merely demonstrates that, at some point in his career, Dr. Ducic performed nerve excisions without a prior nerve block or Botox. Dkt. 51-1 at 2 (Ducic Dep.). It does not establish, however, that this happened at MGUH or, more importantly, that it happened before Marzorati's surgery occurred. In fact, Dr. Ducic specified that this was not his regular practice—he only operated without prior testing when "additional confirmation would not sufficiently or at all change [his surgical] plan." *Id.* Without any evidence that Dr. Ducic engaged in such practices *before* Marzorati's surgery, no reasonable jury could find that MGUH should have known that Dr. Ducic was engaged in dangerous or otherwise incompetent behavior. The Court will, accordingly, grant MGUH's motion for partial summary judgment as to Plaintiffs' negligent supervision claims.

**B.     Dr. Ducic's Motion for Partial Summary Judgment/Judgment on the Pleadings**

Dr. Ducic moves for partial summary judgment, or, in the alternative, for judgment on the pleadings with respect to Plaintiffs' claims for punitive damages. Dkt. 37. At oral argument, the Court indicated that there would be "no punitive damages in the case-in-chief." Dkt. 54 at 80 (Motions Hrg. Tr.). Rather, "if the plaintiffs, at the close of the case-in-chief" or "after the jury comes back with a verdict," still believe that they are entitled to punitive damages, "[the Court] can take [the issue] up at that point in time." *Id.* at 80–81 (Motions Hrg. Tr.). The Court will, accordingly, for the reasons stated on the record, deny Dr. Ducic's motion without prejudice.

---

to indicate that surgery is necessary. *See* Dkt. 48-3 at 26 (Ex. C) (Janis Dep.); *see also* Dkt. 48-2 at 2 (Janis Expert Rpt.) ("Neither diagnostic nerve blocks, nor injection of Botox was performed [in Marzorati's case], nor was this necessary based on her constellation of symptoms.").

11

## CONCLUSION

For the foregoing reasons, MGUH's motion for partial summary judgment, Dkt. 36, is hereby **GRANTED**, and Dr. Ducic's motion for partial summary judgment, or, in the alternative, for judgment on the pleadings, Dkt. 37, is hereby **DENIED** without prejudice.

**SO ORDERED**.

                                        /s/ Randolph D. Moss
                                        RANDOLPH D. MOSS
                                        United States District Judge

Date: April 17, 2019